

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### NO. AP-76,924
---

## STEVEN LAWAYNE NELSON, Appellant

## v.

## THE STATE OF TEXAS

---
### ON APPEAL FROM CAUSE NUMBER 1232507D
### IN THE CRIMINAL DISTRICT COURT NUMBER FOUR
### OF TARRANT COUNTY, TEXAS
---

**KELLER, P.J., delivered the opinion of the unanimous Court.**

On March 3, 2011, Appellant, a twenty-four-year-old Dallas County probationer, entered NorthPointe Baptist Church in Arlington, assaulted and suffocated its pastor, Clinton "Clint" Dobson, and assaulted its secretary, Judy Elliot. While there, appellant stole Dobson's laptop, a cellphone, Elliot's credit cards, and Elliot's car. Appellant was charged with capital murder by intentionally causing Dobson's death in the course of committing or attempting to commit the offense of robbery. A jury found appellant guilty of capital murder and answered the special issues so that appellant was sentenced to death. Appeal to this court is automatic.[1] Appellant raises fifteen

---

[1] TEX. CODE CRIM. PROC. art. 37.071, §2(h).

points of error.  Finding no error, we affirm.

## I. BACKGROUND

### A. Discovery of the Victims

Members of NorthPointe Baptist Church described the events surrounding the discovery of Clint Dobson and Judy Elliot.  Church member Dale Harwell had plans to meet Dobson for lunch.  When Dobson did not arrive at the appointed time, Harwell tried unsuccessfully to contact him.  Debra Jenkins went to NorthPointe at around 12:40, where she saw Dobson's and Elliot's cars in the parking lot.  Jenkins rang the doorbell and called the church office but received no answer, so she left after about five minutes.  She returned fifteen minutes later, and Elliot's car, a Galant, was no longer in the parking lot.  At 1:00 p.m., another church member, Suzanne Richards, arrived for a meeting with Dobson.  His car was in the parking lot, but Elliot's was not.  Richards waited for half of an hour, ringing the doorbell, calling, and texting Dobson.

Meanwhile, Clint Dobson's wife, Laura, called Jake Turner, the part-time music minister, because she had been unable to reach her husband by phone.  Turner agreed to go to the church, and he called Judy Elliott's husband John, who promptly drove to the church.  John entered the church using his passcode and called out Dobson's name.  John saw Dobson's office in disarray and saw a severely beaten woman, whom he did not immediately recognize as his wife, lying on the ground.  He did not notice Dobson lying on the other side of the desk.  John called the police.

Arlington police officer Jesse Parrish responded to the call. He noticed signs of a struggle, including blood and what appeared to be a grip plate of a pistol.  Elliot was lying on her back with her hands bound behind her.  John recognized his wife by her clothing.  Parrish found Dobson lying face-up with his hands bound behind his back.  A bloody plastic bag was covering his head and

sucked into his mouth. Upon lifting the plastic bag off of his head, Parrish knew that Dobson was dead.

Elliot was taken to the hospital in critical condition. She had a heart attack while there and neither the physicians nor John believed she would survive. She had traumatic injuries to her face, head, arms, legs, and back and internal bleeding in her brain. She was in the hospital for two weeks and underwent five months of therapy and rehabilitation. A permanent fixture of mesh, screws, and other metal holds her face together. At the time of trial, Elliot still had physical and mental impairments from the attack.

Doctor Nizam Peerwani, medical examiner for Tarrant County, testified that the manner of Dobson's death was homicide. Dobson's injuries indicated a violent altercation during which he attempted to shield himself from blows from an object such as the butt of a firearm. Two wounds to his forehead appeared to be from the computer monitor stand in the office. According to Dr. Peerwani, the injuries indicated that Dobson was standing when he was first struck in the head and that he was struck in the back of his head as he fell. After he had fallen to the ground and lost consciousness, his hands were tied behind his back, and the bag was placed over his head. With the bag over his head, he suffocated and died.

### B. Appellant's Actions after the Murder

Appellant texted Whitley Daniels at 1:24 p.m., and Daniels told him to bring her a cigar. After stopping at his apartment, appellant drove Elliot's car to a Tire King store, where a customer bought Dobson's laptop and case out of the trunk of the Galant. At around 2:00 p.m., appellant drove to a Tetco convenience store, where he used Elliot's credit card to buy gas, a drink, and a cigar. Anthony "AG" Springs' girlfriend brought AG to the Tetco. When appellant tried to buy gas

for her car, the card was declined. Appellant and AG drove in Elliot's car to the apartment of Claude "Twist" Jefferson and Jefferson's aunt Brittany Bursey.

Daniels testified that appellant and AG arrived at her house with the cigar some time after 3:00 p.m. Appellant and AG soon left, but appellant returned alone fifteen or twenty minutes later. Appellant asked Daniels to go to the mall and use her identification with the credit cards. She declined to do so, and appellant left.

Appellant went to The Parks at Arlington mall. Using Elliot's credit cards at Sheikh Shoes, he purchased a t-shirt featuring the Sesame Street character Oscar the Grouch, and Air Max shoes. He also used the cards to buy costume jewelry at Jewelry Hut and Silver Gallery. Appellant later returned to Sheikh Shoes with two companions, but a second attempt to use the credit card was not approved.

Appellant returned to Bursey's apartment that evening with AG and Twist. Appellant was wearing the shirt, jewelry, and shoes that he had bought with Elliot's cards. While taking pills and smoking, he told Bursey that he had stolen the Galant from a pastor. Appellant left Bursey's apartment the next morning.

The next day, Appellant sent a series of text messages. One asked to see the recipient because "[i]t might be the last time." Another said, "Say, I might need to come up there to stay. I did some shit the other day, Cuz." A third said, "I fucked up bad, Cuz, real bad."

Tracey Nixon, who had dated appellant off and on, picked him up the day after the murder at a gas station on Brown Boulevard. Appellant wore the t-shirt and some of the jewelry that he had bought with Elliot's cards. After going to a Dallas nightclub, appellant spent the night with Nixon, who returned appellant to Brown Boulevard the next morning.

## C. Investigation and Arrest

Officers obtained an arrest warrant and arrested appellant at Nixon's apartment on March 5. At the time of his arrest, appellant was wearing the tennis shoes and some of the jewelry he brought with Elliot's stolen credit cards. He was also wearing a black belt with metal studs. The shoes, belt, phone, and jewelry were seized during appellant's jail book-in.

Officers seized other items from appellant's apartment pursuant to a search warrant. They recovered a pair of black and green Nike Air Jordan tennis shoes that appeared to match a bloody shoe print at NorthPointe, the New Orleans Saints jersey seen on the mall surveillance videos, a gold chain necklace, a pair of men's silver earrings with diamond-like stones, a Nike Air Max shoe box, a Sheikh Shoes shopping bag, a Sesame Street price tag, a Jimmy Jazz business card, and receipts dated March 3 from several of the stores. Officers found Dobson's identification cards, insurance cards, and credit cards in Elliot's car.

DNA from Dobson and from Elliot was discovered in a stain on appellant's shoe. Appellant's fingerprints were lifted from the wrist rest on Dobson's desk, from receipts, and from some of the items from the mall.

A trace-evidence analyst detected similarities between appellant's shoe and a bloody shoe print on an envelope in Dobson's office. Appellant's belt appeared to be missing studs, and similar studs were recovered from the office. According to a firearms expert, the plastic grip panel found in Dobson's office came from a 15XT Daisy air gun, which is a $CO_2$-charged semiautomatic BB gun modeled on a Colt firearm. The jury saw a BB gun manufactured from the same master mold and heard from a text message read into the record that appellant was seeking to buy a gun just days before the killing.

### D. Defense Testimony

Appellant testified on his own behalf. According to him, from about 11:30 p.m. on March 2, until 6:00 or 7:00 a.m. on March 3, he and three companions were looking for people to rob. They had firearms. Appellant went home for a while in the morning but later joined up with AG and Twist. Appellant claimed that he waited outside the church while AG and Twist went in. Twenty-five minutes later, he went inside and saw the victims on the ground. They were bleeding from the backs of their heads, but they were still alive. Appellant then took the laptop and case. According to appellant, AG gave him keys and credit cards. Appellant waited in Elliot's car for a while and then returned to Dobson's office. By that time, the man was dead. Appellant could not stand the smell, so he returned to Elliot's car. He drove the group to his apartment, retrieved a CD and his New Orleans Saints jersey, and continued to Bursey's apartment, where they smoked marijuana. Appellant then left Bursey's apartment in Elliot's car.

Appellant testified that he knew people were inside the church and that he agreed to rob them. He claimed that he did not intend to hurt anyone and had no part in what happened inside of the church. He also acknowledged making the purchases at Tetco and buying the items at the mall.

Appellant testified to having several prior convictions.

### II. SUFFICIENCY OF THE EVIDENCE

### A. Guilt

In his sixth point of error, appellant alleges that the evidence is legally insufficient to support a finding of guilty of capital murder. At the conclusion of the guilt phase, appellant moved for a directed verdict of not guilty. The trial court denied the motion.

In reviewing the sufficiency of the evidence, we view all of the evidence in the light most

favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a rational factfinder could have found the essential elements of the crime beyond a reasonable doubt.[2]

Appellant calls our attention to four items—a tape, two tape swabs, and an electrical cord—that were tested for DNA. A State's witness testified that she found on these items a mixture of DNA profiles. The major contributor on the tape and the tape swabs was Elliott. The major contributor on the electrical cord was Dobson. Appellant was excluded as a contributor of the DNA on all four items. He claims that the lack of his DNA on these items from the scene exculpated him and he argues that it renders the evidence legally insufficient to support the conviction.

Appellant fails to view the evidence in the light most favorable to the verdict. Given the evidence elsewhere detailed in this opinion, the evidence of appellant's guilt is not rendered insufficient by the fact that DNA testing fails to connect him to four items of evidence. A rational jury could find beyond a reasonable doubt that appellant intentionally and knowingly caused Dobson's death while in the course of committing or attempting to commit robbery. Appellant's sixth point of error is overruled.

## B. Future Dangerousness

In appellant's second issue, he claims that the evidence was legally insufficient to support the jury's verdict with respect to the future-dangerousness special issue and that the imposition of a death sentence in this case was arbitrary and capricious.

### 1. *Standard of Review*

---

[2] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).

After finding appellant guilty of capital murder, the jury must decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[3] In assessing the legal sufficiency of the evidence to support a finding of future dangerousness, this Court must view the evidence in the light most favorable to the jury's finding and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the defendant would commit crimes of violence that would constitute a continuing threat to society.[4] The jury is the exclusive judge of the facts.[5] We assume that the factfinder resolved conflicts in the evidence in favor of the verdict reached and defer to that resolution.[6]

In deciding the issue of future dangerousness, the factors that a jury may consider include, but are not limited to: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was acting alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; (7) psychiatric evidence; and (8) character evidence.[7] No one factor is dispositive, and an affirmative answer to the special

---

[3] TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1).

[4] *Coble v. State*, 330 S.W.3d 253, 265 (Tex. Crim. App. 2010).

[5] *Matchett v. State*, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996).

[6] *Id.*

[7] *Martinez v. State*, 327 S.W.3d 727, 730 n.4 (Tex. Crim. App. 2010); *Reese v. State*, 33 S.W.3d 238, 245 (Tex. Crim. App. 2000).

issue may withstand a sufficiency challenge notwithstanding the lack of evidence relating to one or more of these factors.[8]

## 2. *The State's Punishment Evidence*

Evidence was introduced during the punishment phase regarding appellant's youth history in and out of institutions in Oklahoma and Texas, his adult criminal history, and his infractions while incarcerated.

### a. Youth History in Oklahoma

Appellant began getting into trouble with Oklahoma juvenile authorities when he was six years old. His juvenile career included property crimes, burglaries, and thefts. Despite efforts by Oklahoma authorities to place him in counseling and on probation, appellant was incarcerated in that state at a young age because he continued to commit felonies. According to Ronnie Meeks, an Oklahoma Juvenile Affairs employee who worked with appellant, this was "quite alarming."

Appellant was sent to a detention center in Oklahoma for high-risk juveniles. On one occasion, while Meeks was driving appellant to the facility for diagnostic services, appellant fled from Meeks' pickup truck. He was apprehended a few minutes later. At the facility, appellant was disruptive and tried to escape. After a few weeks, appellant was sent to a group home in Norman, Oklahoma, for counseling. There, appellant did not fare well. He was disruptive and did not try to make any improvements.

When Meeks needed cooperation from appellant's mother, she was available. Appellant never appeared to Meeks to be in need of anything; his mother appeared to be providing enough.

Meeks testified that, in addition to being uncooperative with the efforts in Oklahoma to

---

[8] *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex. Crim. App. 1995).

provide services and to rehabilitate appellant, appellant never exhibited any remorse about any of his actions.

*b. Youth Offenses in Texas*

Appellant was also involved in the Texas juvenile justice system through the Tarrant County probation office. Mary Kelleher, of that office, first had contact with appellant in April 2000, when he was thirteen years old. The police referred appellant to her for having committed aggravated assault with a deadly weapon. Kelleher worked with appellant during a time when he was pulling fire alarms, was truant, and was declining in school performance. In December 2001, the police department again referred appellant to Kelleher for multiple charges, including burglaries of a habitation, criminal trespass of a habitation, and unauthorized use of a motor vehicle. After the department was notified that appellant was a runaway, the juvenile court detained him until all of the charges were disposed.

The Tarrant County juvenile court adjudicated appellant, then fourteen years old, for burglary of a habitation and unauthorized use of a motor vehicle. He was committed to the Texas Youth Commission ("TYC") for an indeterminate period. According to Kelleher, it is unusual for a juvenile to be committed to TYC for property crimes at that age, but appellant's history made him a rare case.

Kelleher testified that appellant had family support from his mother but none from his father. Appellant's mother was neither abusive nor neglectful. According to appellant's mother, his two siblings went to college and did not get into trouble. Appellant indicated to Kelleher that he knew his actions were wrong, but he acted out of impulse and boredom, without an exact reason.

Appellant was a "chronic serious offender." While in TYC, appellant had four of the

highest-level disciplinary hearings and was repeatedly placed in the behavior-management plan. Appellant was originally sent to TYC for nine months, but he spent over three and a half years confined because of his infractions. This sentence for a burglary adjudication was an extraordinarily lengthy time to spend in TYC. He eventually made parole, had his parole revoked, and returned to TYC.

Appellant was paroled from TYC a second time. On his second parole, when appellant was twenty years old, he again did not comply with the terms, even after counseling. His parole officer issued a directive to apprehend appellant for these violations, but he "aged out" of the juvenile system before he could be picked up, allowing him to remain unapprehended.

*c. Adult Arrests and Convictions*

In 2005, appellant, then eighteen years old, was stopped while driving a stolen car. The officer who arrested him concluded that appellant was "a compulsive liar."

Video evidence and testimony from November 30, 2007, showed Appellant in a Wal-Mart stock room posing as an associate from a different store. Appellant put a laptop computer down his pants and then walked to the exit. The following week, appellant was apprehended at a separate Arlington Wal-Mart for putting on new boots off the shelf and leaving the store without paying.

After being released from state jail in 2010, appellant assaulted his live-in girlfriend, Sarina Daniels. When Sarina ran outside after an argument, appellant caught her and dragged her inside. When she tried to call 9-1-1, he broke her telephone. Appellant bound Sarina with duct tape and tried to have her stand on a trash bag so her blood would not get on the carpet. He held a knife to her throat while holding her by the hair and made her apologize for talking to another man while appellant was incarcerated. Appellant pulled the knife away and told Sarina that he was not going

to kill her. He then grabbed her by the throat, pushed her onto a dresser, and said, "But if you do it again, then I will." Appellant then choked Sarina. Sarina filed charges, and appellant was arrested.

For this aggravated assault with a deadly weapon, appellant was placed on probation and sent to a ninety-day program at the Intermediate Sanctions Facility ("ISF") in Burnet. Sherry Price, a Dallas County probation officer, told appellant to report as soon as he was released from the program, which appellant failed to do. After appellant failed to report as directed, Price told him to report to her on March 3. He did not report, and hours later, he killed Clint Dobson.

### d. Early Jail Infractions

Appellant was classified as an assaultive inmate in the Tarrant County Jail while awaiting trial. For a time, he was in restrictive housing, but he nevertheless committed numerous serious disciplinary infractions. Among other things, appellant broke a telephone in the visitation booth and then threatened the responding officer. After one altercation with a guard, it took three officers to subdue appellant. One officer's foot was fractured. In another incident, appellant refused to return to his cell. Three officers tried to escort him to his cell, but appellant stood in his cell door to prevent it shutting. When officer Kent Williams reached in to slide the door shut, appellant grabbed him, struck him in the face, pulled him into his cell, and threw him on the desk and into a wall.

Appellant was also combative with other inmates and, on at least one occasion, was complicit in arranging for a bag filled with feces and urine to be placed in another inmate's cell. After appellant was assigned to a tank for problematic inmates, he broke the lights in his cell.

On February 22, 2012, appellant broke multiple fire-sprinkler heads and flooded the day room. The jury saw photographs and video of this, including appellant dancing in the water. Six officers restrained him. Breaking the sprinkler heads triggered the fire alarm in the whole jail.

*e. Killing of Jonathon Holden*

On March 19, 2012, while appellant was in the Tarrant County jail awaiting trial in this case, he killed Jonathon Holden, a mentally challenged inmate. According to a fellow inmate who witnessed the incident, Holden had angered inmates when he mentioned "the N word under his voice." Appellant was in the day room of the holding area, and he talked Holden into faking a suicide attempt to cause Holden to be moved to a different part of the jail. Holden came to the cell bars, and appellant looped a blanket around Holden's neck. Appellant tightened the blanket by bracing his feet on the bars and pulling with both hands on the blanket. Holden's back was against the bars and he was being pulled up almost off his feet. It took four minutes for Holden to die. Afterwards, appellant did a "celebration dance" in the style of Chuck Berry, "where he hops on one foot and plays the guitar." Appellant used a broom stick, which he had previously used to poke another mentally challenged inmate in the eye, as a guitar.

*f. Jail Infractions while Segregated.*

Following Holden's death, Appellant was assigned to a single-man, self-contained cell for dangerous and violent inmates. On April 22, 2012, officers found contraband, such as a broom handle and extra rolls of toilet tissue, in appellant's cell. In May 2012, a search of appellant's cell yielded a bag of prescription drugs.

On July 20, 2012, a few weeks before trial, appellant damaged jail property in a two-hour-long incident, of which the jury saw security footage and heard testimony. While in a segregation cell, appellant blocked the window with wet toilet paper. He then flooded his cell. Ultimately, the officers had to use pepper spray to subdue appellant. Officers in protective gear restrained appellant and took him to the decontamination shower. During this time, appellant rapped and sang. While

his own cell was decontaminated, appellant flooded the toilet in the holdover cell. He brandished a shank made from a plastic spoon. When he was being returned to his cell, appellant fought and threatened the officers. They ultimately placed him in a restraint chair, a process that took eight officers. This disturbance took about seventy percent of the jail's manpower. Sergeant Kevin Chambliss, who testified about the incident, had to request back-up personnel from another facility.

On August 23, 2012, on a day of voir dire proceedings, appellant cracked one of the jail's windows and chipped off paint with his belly chain while in the jail gym. He showed no remorse. Appellant's dangerous activity continued after the guilt phase of trial. After the jury's verdict was read, while appellant was in a holdover cell, he ripped the stun cuff off of his leg. Again, he showed no remorse. During trial, while appellant was being escorted from the jail to the courtroom, he tried to move his cuffs from behind his back multiple times. During the punishment phase, officers found three razor blades inside letters addressed to appellant, along with other contraband items.

### g. Prior Convictions

Appellant's prior convictions comprised failure to identify, unauthorized use of a motor vehicle, burglary of a building, and numerous thefts.

### 3. Defense Evidence

The defense put on a forensic psychologist, Doctor Antoinette McGarrahan. She testified that, although appellant had no current learning disability or cognitive impairment, he had a past history of learning disabilities. Dr. McGarrahan explained that, when, as a three-year-old, appellant set fire to his mother's bed with intent to cause harm, it was essentially a cry for attention and security. She believed that there was "something significantly wrong with [appellant's] brain being wired in a different way, being predisposed to this severe aggressive and violence from a very early

age." She testified that, by the time appellant was six years old, he had had at least three EEGs, meaning that people were already "looking to the brain for an explanation" of his behavior. The test results did not indicate a seizure disorder, but Dr. McGarrahan said that they did not rule out appellant having one. Risk factors present in appellant's life included having ADHD, a mother who worked two jobs, an absent father, verbal abuse, and witnessing domestic violence.

Appellant spoke about two alter egos, "Tank" and 'Rico." Dr. McGarrahan did not believe that appellant had dissociative-identity disorder; rather, these alter egos were a way to avoid taking responsibility for his actions.

Dr. McGarrahan acknowledged on cross-examination that appellant likes violence and has a thrill for violence and that it is emotionally pleasing to him. She said he is "criminally versatile," and she agreed that characteristics of antisocial personality disorder describe him. According to her, people with antisocial personality disorder have trouble following the rules of society and repeatedly engage in behavior that is grounds for arrest. They are consistently and persistently irresponsible and impulsive; they tend to lie, steal, and cheat. Appellant has many characteristics of a psychopath—including a grandiose sense of self, a lack of empathy, and a failure to take responsibility. Generally, such a person prefers to lie, cheat, and steal to get by.

### 4. *Conclusion*

The evidence in the present case amply supports a finding of future dangerousness. Appellant has a long history of bad behavior, both inside and outside a confinement setting. The worst of this behavior includes not only the capital murder charged in the present case but also the killing of a mentally challenged inmate while appellant's capital murder charges were pending. Appellant's second point of error is overruled.

## III. VOIR DIRE

### A. Exemptions and Disqualifications

In appellant's eighth point of error, he claims that the trial court erred by denying his motion that the trial judge preside over potential juror claims of exemptions or disqualifications.

Appellant filed motions requesting that the trial court summon a special venire and arguing that a court administrator or designee could not hear excuses and disqualifications of potential jurors.[9] The trial court denied these motions but later agreed to reconsider the motions and held a pretrial hearing. At the hearing, the jury bailiff for Tarrant County, Paula Morales, testified that she is in charge of sending out the jury summonses to prospective jurors. August 2, 2012—the day that the venire panel for appellant's case met—would have been a normal day. The trial judge informed Morales that he needed a large panel. Morales summoned around 1,300 people to appear on August 2. Normally, she would summon at least 400, and the most she would ever summon would be about 1500. Only some of the jurors called for August 2 would be assigned to appellant's trial. The others would be assigned to other courts. Appellant argued that, because the normal procedure was altered to call in more jurors, it amounted to a special venire. The trial court again denied the motions.

The Government Code allows a court's designee to hear excuses and exemptions under certain circumstances.[10] In large counties, it is common for courts to gather a general assembly, have the court's designee review the exemptions and disqualifications of members of the assembly, and

---

[9] *See* TEX. CODE CRIM. PROC. arts 34.01, 35.03.

[10] TEX. GOV'T CODE § 62.015(b).

then draw the venire panels from the remaining pool.[11]

There is an alternative manner by which venire panels can be summoned for capital cases. These are known as "special venires."[12] A trial judge who has called a special venire cannot designate others to make decisions with respect to excuses or qualification.[13] If a court refuses a motion for a special venire, the case is to be tried by regular jurors summoned for service for the week in which the capital case is set for trial.[14]

Nothing about the statutes that govern special venires is related to the size of the panel. The mere fact that a large number of jurors is summoned to jury service does not mean that the venire is a special venire. The general assembly portion of jury selection was not part of appellant's trial, and appellant was not entitled to be present.[15] This specific type of panel selection has been approved by this court.[16] The trial judge was not required to preside over exemptions and qualifications. Appellant's eighth point of error is overruled.

### B. Authorization of the Visiting Judge to Conduct Individual Voir Dire

In his first point of error, appellant contends that the trial court violated Article 5, Section 7,

---

[11] 43 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE & PROCEDURE § 35.15, at 422 (2d ed. 2001) ("In most counties, jurors are summoned to meet the needs of more than one trial. They are first assembled in a general jury panel. . . . Members of the general jury panel are qualified as to their ability to serve on a jury and excuses from service are heard. Those remaining on the panel after the winnowing processes are then divided into trial panels, which are sent to the courts that will be trying cases.").

[12] TEX. CODE CRIM. PROC. art. 34.01.

[13] *Id.* art. 35.03.

[14] *Id.* art. 34.01.

[15] *Jasper v. State*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001).

[16] *Esquivel v. State*, 595 S.W.2d 516, 521 (Tex. Crim. App. 1980).

of the Texas Constitution by denying his motion for mistrial, which alleged the absence of a valid order authorizing the visiting judge to conduct voir dire.

### 1. *Judicial Districts*

The courts of the state lie within administrative judicial regions.[17] The presiding judge of an administrative judicial region assigns "the judges of the administrative region to hold special or regular terms of court in any county of the administrative region to try cases and dispose of accumulated business."[18]

### 2. *Procedure*

The Honorable Jeff Walker, Presiding Judge of the 8th Administrative Region, signed an order on August 1, 2012, assigning Elizabeth Berry, former judge, to the Criminal District Number Four beginning on August 2.[19] Among other things, the order stated:

---

[17] TEX. GOV'T CODE § 74.042.

[18] *Id.* § 74.056(a).

[19] The August 1 order reads, in its entirety:

> Pursuant to Section 74.056, Texas Government Code, I assign the Honorable Elizabeth Berry, Former Judge of the Criminal District No. 3 to the Criminal District Court No. 4 of Tarrant County, Texas.
> The judge is assigned for a period of 1 days, beginning August 2nd, 2012. If the judge begins a trial on the merits during the period of this assignment, the assignment continues in such case until plenary jurisdiction has expired or the undersigned Presiding Judge has terminated this assignment in writing, whichever occurs first.
> It is ordered that the Clerk of the Court to which this assignment made, if it is reasonable and practicable, and if time permits, give notice of this assignment to each attorney representing a party to a case that is to be heard in whole or in part by the assigned judge.
> It is further ordered that the Clerk, upon receipt hereof, shall post a copy of this order in a public area of the Clerk's office or courthouse so that attorneys and parties may be advised of this assignment.

The judge is assigned for a period of 1 days, beginning August 2nd, 2012. If the judge begins a trial on the merits during the period of this assignment, the assignment continues in such case until plenary jurisdiction has expired or the undersigned Presiding Judge has terminated this assignment in writing, whichever occurs first.

On August 2, appellant was arraigned, and Judge Berry heard the qualifications and exemptions for the prospective jurors. Individual voir dire began on August 13, 2012, and continued for the next four days. Appellant moved for mistrial on August 20, 2012.

Appellant called Presiding Judge Walker as a witness and introduced four orders by which Judge Walker assigned Judge Berry, including the August 2nd order. Judge Walker testified that, when he appoints a judge to a court, it is for "[w]hatever is on the docket for the day" and that Judge Berry "can do any case that comes before her on that date." Judge Walker testified that the other three orders were for payment purposes, and they did not re-appoint Judge Berry to the case because she was already assigned to the case. Notably, he said that trial on the merits does not mean when the jury is seated and when jeopardy attaches, but "it means everything. . . . [t]he whole shootin' match."

Appellant argues that Judge Walker was wrong about the meaning of "trial on the merits" in the context of the order. Appellant points out that jeopardy attaches in a jury trial when the jury is empaneled and sworn. His position is that the trial on the merits, therefore, did not begin in this case until the jury was empaneled and sworn. Because trial on the merits had not begun during the time that Judge Berry presided over voir dire, he claims that the "trial on the merits" language in the order was inadequate to continue Judge Berry's appointment past August 2.

We disagree. Appellant does not explain why double-jeopardy concepts have any bearing

Signed, Jeff Walker, Presiding Judge, 8th Administrative Judicial Region of Texas.

on what "trial on the merits" meant in the context of the order, and we see no reason that they would. Judge Walker intended to assign Judge Berry for "the whole shootin' match" and the order accomplished that design.[20]  Appellant's first point of error is overruled.

### C. *Batson* challenge

In appellant's fifth point of error, he claims that the trial court violated the Equal Protection Clause by overruling his *Batson*[21] objections to the State's peremptory strikes of two minority venire members.

A *Batson* challenge involves three steps: (1) there must be a prima facie showing that a venire member was peremptorily excluded on the basis of race; (2) the striking party must then tender a race-neutral reason for the strike; and (3) if a race-neutral reason is tendered, the trial court must then determine whether the objecting party has proved purposeful discrimination.[22]  The trial court's ruling on a *Batson* challenge is sustained on appeal unless it is clearly erroneous.[23]  This highly deferential standard is employed because the trial court is in the best position to determine whether the State's justification is actually race-neutral.[24]  A defendant's failure to offer rebuttal to a prosecutor's race-neutral explanation can be fatal to defendant's claim.[25]

Appellant raised a *Batson* challenge regarding five venire members.  The trial court found

---

[20]  The State also argues that appellant failed to preserve this claim for review.  We need not address this argument because we reject appellant's claim on the merits.

[21]  *Batson v. Kentucky*, 476 U.S. 79 (1986).

[22]  476 U.S. at 97-98; *Blackman v. State*, 414 S.W.3d 757, 764 (Tex. Crim. App.  2013).

[23]  *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012).

[24]  *Id.*

[25]  *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002).

that he had made a *prima facie* case, so the burden shifted to the State to tender race-neutral explanations. The State noted which black and Hispanic minority members were struck by the defense, then proffered explanations for the five challenged venire members: Venire member Spivey slept during instructions from the bench and denied arrests that the State was aware of, claimed that he did not want to serve on the trial because he did not believe appellant could get a fair trial, explained that he did not want to sit around on jury service without being paid overtime, and indicated that he had trouble sitting in judgment of other people. Venire member Lee-Moses indicated that she was not in favor of the death penalty and could not assess the death penalty regardless of the facts or circumstances of the case. She also would have problems with a "circumstantial case," and she believed the death penalty had been used unfairly in the past. Venire member Southichack indicated that she has a problem judging. She was not in favor of the death penalty, and she did not believe it should ever be invoked. She seemed to the prosecutors to have difficulty with the legal issues related to the special issues. She also said she would have trouble answering question number two "yes" if she believed appellant was not the trigger person. Venire member Hooper Golightly belonged to a church that was opposed to the death penalty, and she did not disagree with that position. She was not in favor of the death penalty, and she thought it should never be invoked. Venire member Mays served on a trial that resulted in a mistrial. She thought the death penalty should never be invoked, and it was not on the top of her list for a possible punishment.

The trial court found that the State "offered reasonable, race-neutral reasons" for its peremptory strikes against the challenged members. Appellant then pointed out that three of the members that the State exercised peremptory strikes on were not challenged for cause, and said "the

record speaks for itself."

Appellant failed to rebut the State's race-neutral reasons for its strikes, and the record supports the trial court's determination that the State did not engage in purposeful discrimination. His fifth point of error is overruled.

### D. Possible Prospective Jurors Seeing Appellant Wearing Chains.

In his ninth point of error, appellant claims that the trial court erred by overruling his objection that he was escorted to the courtroom wearing chains in view of prospective jurors. On August 2, 2012, the venire assembled in the central jury room. Appellant's counsel told the trial court that, while appellant was being escorted from the holdover cell, appellant was dressed in civilian clothes and "wearing chains around his legs and wearing chains which [were] visible around his arms." According to defense counsel, four or five prospective jurors were in the lobby, and at least one looked at the group accompanying appellant. Counsel could not tell if the prospective jurors were for appellant's trial.

We have held that requiring an accused person to wear handcuffs before the jury infringes his constitutional presumption of innocence.[26] However, "a momentary, inadvertent, and fortuitous encounter away from the courtroom between a handcuffed accused and one or more of the jurors does not necessarily call for a mistrial or reversal."[27] Here, appellant could not even say whether the venire members who were encountered outside the courtroom were for appellant's case, nor did he request an opportunity to determine that. Moreover, it appears that the encounter between appellant and the individuals outside the central jury room was a momentary, inadvertent, and fortuitous

---

[26] *Clark v. State*, 717 S.W.2d 910, 918-19 (Tex. Crim. App. 1986).

[27] *Id.* at 919 (citing *Wright v. Texas*, 533 F.2d 185, 187 (5th Cir. 1976)).

encounter.  Appellant's ninth issue is overruled.

## IV.  EVIDENTIARY ISSUES

### A. Relationship with Tracey Nixon

In appellant's third issue, he complains about the admission at the guilt phase of trial, during the testimony of Tracey Nixon, of text messages from his cell phone.  He contends that the text messages were inadmissible because they showed that he had a sexual relationship with another man, which would constitute an extraneous bad act.  He further contends that the State had no need for the evidence and that the unfair prejudice substantially outweighed any minimal probative value.

Tracey Nixon is a man who dresses and presents as a woman.[28]  Nixon testified in a hearing outside the presence of the jury that he had dated appellant periodically for about two years and had given appellant the phone that was seized during appellant's arrest, as well as setting up the account for that phone.  The State sought to introduce text messages to and from the phone and argued that the text messages were relevant to establish time line and identity.

Appellant objected to some of the contents of the text messages on the basis that they included extraneous matters—"drugs, as well as homosexuality." The State agreed to excise the references to drugs but contended that the relationship between appellant and the witness was a legitimate matter of inquiry.

In front of the jury, the State questioned Nixon briefly about his relationship with appellant. This questioning established that Nixon and appellant "were on and off dating" for two years.  Nixon acknowledged that he and appellant were "very close."  This questioning did not bring up Nixon's gender or the fact that the relationship was homosexual in nature.

---

[28] Nixon also testified that he had hair and wore make-up like a woman.

Subsequently, the State questioned Nixon about various text messages sent by appellant. Most of the questioning focused on the timing and sequence of the texts, without referring to their content. When the content of the message was referenced, it was nearly always paraphrased in general terms, and any quotations of the messages were brief and referenced only the fact that appellant and Nixon had a relationship, without discussing Nixon's gender or the homosexual nature of the relationship.[29] The State also asked about some of the text messages sent by Nixon, which included a statement, "Baby, are you there?" The jury was not given a transcript of any of these text messages.[30]

On cross-examination, defense counsel questioned Nixon about the fact that he was a man who dressed as a woman. Defense counsel also asked questions about the non-traditional (i.e. homosexual) nature of Nixon and appellant's relationship.

Upon review of the record, we conclude that it was the defense, not the State, that introduced evidence that the relationship between appellant and Nixon was homosexual in nature. If appellant had not brought up the subject, then it would not have been presented to the jury, except if jurors had

---

[29] The State and the witness once described a text message as referring to "how he [appellant] was feeling," that appellant was "confused," and that the text message had "something to do with your [the witness's] relationship with the defendant." In another text message, the defendant replied, "yeah" to Nixon's text saying, "I wish you were here." Another group of text messages between the two was referred to as discussing plans for Nixon's upcoming birthday. In a later text, Nixon offered to pick appellant up to go out, and appellant eventually responded, "Come and get me." Subsequent texts were described as "mak[ing] plans at that point to go out." These are all the references to the content of appellant's text messages that the jury received during Nixon's testimony.

[30] Later in the trial, the jury was given a transcript of selected text messages that, according to the State, indicated appellant's guilt of the charged offense. Appellant does not claim that any of these text messages relate to his current complaint. See the discussion of appellant's fourth issue, below.

been able to tell the biological sex of the witness. Moreover, appellant never objected to the direct-examination testimony by Nixon that he and appellant had a close dating relationship. Any juror who could determine that Nixon was a man would have realized from the "dating" testimony alone that Nixon and appellant had a homosexual relationship. A defendant who allows evidence to be introduced from one source without objection forfeits any subsequent complaints about the introduction of the same evidence from another source.[31] Appellant's third point of error is overruled.

## B. Admission of Other Text Messages

Appellant argues in his fourth point of error that the trial court abused its discretion by admitting extraneous offense evidence in the guilt phase that was not relevant beyond character conformity, and he claims that the unfair prejudice stemming from it substantially outweighed any minimal probative value. During guilt, the State sought to introduce messages sent from appellant's cell phone.[32] Outside the presence of the jury, Appellant objected that the messages were irrelevant,

---

[31] *Reyes v. State*, 84 S.W.3d 633, 638 (Tex. Crim. App. 2002).

[32] The text messages were published to the jury by reading them into the record as follows:

[PROSECUTOR]: State's Exhibit 393, MetroPCS SMS text messages.

Message date, February 28th, 2011, from the Defendant 214-290-2632, "Need to buy a gun, can you find me one?"

Message, March 4th, 2011, from the Defendant, 214-290-2632, "Say, I might need to come up there to stay. I did some shit the other day, Cuz."

Message, March 4th, 2011, to the Defendant, "Okay, bro."

Message, March 4th, 2011, from the Defendant, 214-290-2632, "I fucked up bad, Cuz, real bad."

contained extraneous matters, and were more prejudicial than probative. The State argued that a "potential firearm" was used and that the other messages were relevant to show appellant's state of mind. The trial court overruled this objection and said that it would give a limiting instruction, which it did when the evidence was introduced and also in the jury charge.

We review a trial court's decision to admit evidence under an abuse-of-discretion standard.[33] The trial court's ruling will be upheld if it falls within the "zone of reasonable disagreement."[34] Relevant evidence is anything that tends to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[35]

Appellant argues that the text message in which he asked for assistance in buying a gun had minimal, if any, probative value because the victims in this case were not shot by a firearm and there was no evidence of the discharge of a firearm at the scene. The State relies upon the testimony that showed that Dobson was struck with a grip plate from a BB gun that was designed to look like a Colt firearm. It claims that this text message was admissible to show appellant's preparation, planning, and intent in the days leading up to the murder. The jury was instructed about the permissible purposes of the evidence at the admission of the evidence and in the jury charge. The trial court did not abuse its discretion in admitting this evidence.

Appellant also complains of the admission of text messages that referred to "needing a place to stay because he had done something bad." These messages were highly probative of appellant's

---

[33] *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

[34] *Id.*

[35] TEX. R. EVID. 401.

consciousness of guilt. The trial court did not err in admitting them into evidence. Appellant's fourth point of error is overruled.

### C. Texas Youth Commission Records

In his seventh point of error, appellant alleges that the trial court violated his Sixth Amendment right to confrontation by admitting, over objection, testimonial statements from Texas Youth Commission disciplinary records. During punishment, the State elicited testimony from Manny Carrera of the Texas Juvenile Justice Department regarding the records of appellant's time there.

Carrera was asked how many separate disciplinary infractions appellant had during his time at TYC. Appellant objected to this as "confrontational, personal knowledge," and the trial court overruled his objection. Appellant objected again, and his objection was again overruled. Nevertheless, the State did not require Carrera to answer the question. Instead, the prosecutor went on to ask him about levels of sanctions and housing. No violation of the Sixth Amendment occurred.

Appellant also refers to specific segments of exhibits and quotations from testimony that he claims violated the Confrontation Clause. We do not find these statements and documents at the record citations appellant provides.[36] We overrule appellant's seventh point of error.

### V. PUNISHMENT CHALLENGES

In appellant's tenth point of error, he claims that the trial court erred in overruling his motion

---

[36] *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, *with appropriate citations* to authorities and *to the record*.") (emphasis added). Moreover, in *Segundo v. State*, 270 S.W.3d 79, 106-107 (Tex. Crim. App. 2008) (op. on rehearing), the defendant complained of the exact same statements of which appellant now complains. We held that the statements were not testimonial in nature and did not violate the Confrontation Clause. *Id.*

to declare the "10-12" rule unconstitutional for creating an arbitrary and impermissible risk of imposing the death penalty. This Court has repeatedly held that the 10-12 rule does not violate the constitution.[37] Appellant's tenth point of error is overruled.

Appellant alleges in his eleventh point of error that the trial court erred in refusing to instruct the jury that if a single juror "holds out" for life, appellant would receive a sentence of life imprisonment by operation of law. We have held that this provision does not violate the United States Constitution.[38] Appellant's eleventh point of error is overruled.

In appellant's twelfth point of error, he alleges that Article 37.071 is unconstitutional for not placing a burden of proof regarding aggravating evidence. We have rejected this argument.[39] The mitigation special issue is a defensive issue in which the State has no burden of proof.[40] Point of error twelve is overruled.

In appellant's thirteenth point of error, he alleges that the trial court erred in overruling appellant's motion to preclude the imposition of the death penalty on grounds that the indictment failed to contain any allegations regarding the punishment special issues. Appellant claims that the *Ring* line of cases requires that every fact relied upon to answer the special issues must have the

---

[37] *Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008); *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008).

[38] *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Shannon v. State*, 942 S.W.2d 591, 600-01 (Tex. Crim. App. 1996).

[39] *Luna*, 268 S.W.3d at 608-09; *Busby*, 253 S.W.3d at 667-68; *Saldano v. State*, 232 S.W.3d 77, 104-09 (Tex. Crim. App. 2007).

[40] *Smith v. State*, 297 S.W.3d 260, 277-78 (Tex. Crim. App. 2009).

burden of proof defined.[41] We have addressed and rejected this argument.[42] Appellant's thirteenth point of error is overruled.

In Appellant's fourteenth point of error, he claims that the trial court erred by overruling his objection to the application of Texas's death-penalty scheme because it has been arbitrarily imposed in violation of the Eighth and Fourteenth Amendments. Appellant argues that the variety of sentencing schemes that have been designed and implemented by the State to respond to Constitutional requirements has created a variety of possible ways that one could be sentenced to death, and therefore the scheme is arbitrary. We have rejected similar arguments.[43] Appellant's fourteenth point of error is overruled.

In his fifteenth point of error, appellant claims that the Texas death-penalty statute violates the jury-trial guarantee of the Sixth Amendment and the due-process guarantee of the Fourteenth Amendment by failing to place upon the State the burden of proving beyond a reasonable doubt a negative answer to the mitigation special issue. Here, appellant argues that the Supreme Court requires that a jury find beyond a reasonable doubt that aggravating circumstances outweigh mitigating factors before it can answer "no" to the third special issue.[44] We have held that the *Apprendi-Ring-Blakely* line of cases does not require a burden of proof on the mitigation special

---

[41] *See Ring v. Arizona*, 536 U.S. 584 (2002).

[42] *Freeman v. State*, 340 S.W.3d 717, 731-32 (Tex. Crim. App. 2011); *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006).

[43] *See Gallo v. State*, 239 S.W.3d 757, 779-80 (Tex. Crim. App. 2007); *Threadgill v. State*, 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004)*; Rayford v. State*, 125 S.W.3d 521, 533-34 (Tex. Crim. App. 2003).

[44] *See Blakely v. Washington*, 542 U.S. 296 (2004); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring*, 536 U.S. 584.

issue.[45]  Appellant's fifteenth point of error is overruled.

## VI. Conclusion

Having found no error, we affirm the trial court's judgment.

Delivered: April 15, 2015
Do not publish

---

[45]  *Luna*, 268 S.W.3d at 608-09; *Threadgill*, 146 S.W.3d at 671-72.